IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARILYN ADAMS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 17-621 |
| | : | |
| v. | : | |
| | : | |
| ZIMMER US, INC., ZIMMER | : | |
| HOLDINGS, INC., ZIMMER, INC., and | : | |
| ZIMMER SURGICAL, INC., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                August 14, 2018

The plaintiff brought this action to recover for injuries she suffered because of an allegedly defective hip prosthesis manufactured by the defendants, which was implanted in 2011. For several years following her hip replacement surgery, she suffered pain and complications related to the prosthesis. In 2015, she underwent a second surgery to remove and replace the prosthesis. She asserts that the metals the defendants used in manufacturing the prosthesis, combined with an unreasonably dangerous design, generated toxic levels of metal wear debris that injured the tissue surrounding her right hip and required her doctor to remove the prosthesis.

Currently before the court is one of the defendants' two pending motions for summary judgment. In this motion, the defendants contend that Pennsylvania's statute of limitations bars the plaintiff's claims because she failed to file suit within two years after she should have been aware of her injuries and that there was a causal connection between her injuries and the prosthesis. The plaintiff, on the other hand, argues that she timely filed suit because, despite her doctor's suspicions and preoperative diagnosis that the prosthesis was the source of her

problems, she was not, and should not have been, aware of the true cause of her injuries until after her doctor removed the prosthesis. After careful review and consideration of both parties' arguments and the evidence presented in the record, the court is constrained to agree with the defendants that there is no genuine issue of material fact and the plaintiff's claims against the defendants are time-barred.

The court is cognizant of the harsh nature of this outcome. The plaintiff suffered serious, life-altering injuries, and she has invested considerable time, resources, and effort into actively litigating this case. But it is the court's duty to apply the law fairly and evenly in all cases, regardless of the court's personal distaste for an outcome that prevents the jury from addressing the parties' contentions in this case. Thus, even though the plaintiff narrowly missed filing the instant action within the statute of limitations, this harsh result is unavoidable and the court will grant the defendants' motion for summary judgment.

## I.     PROCEDURAL HISTORY

On February 10, 2017, the plaintiff, Marilyn Adams ("Adams"), filed a complaint against the defendants, Zimmer US, Inc., Zimmer Holdings, Inc., Zimmer, Inc., and Zimmer Surgical, Inc. (collectively, "Zimmer"). Doc. No. 1. The complaint asserted five counts: one count for strict products liability, one count for negligence, and three counts for breach of warranty. *See* Compl. In response, Zimmer moved to dismiss the complaint on April 17, 2017.[1] Doc. No. 8. On May 31, 2017, the court entered an order (1) granting the motion to dismiss insofar as Zimmer sought to have the court dismiss Adams's negligent misrepresentation claim and breach

---

[1] In the motion to dismiss, Zimmer argued that the court should dismiss the complaint because: (1) Pennsylvania law did not recognize Adams's claims for design defect, manufacturing defect, failure to warn, and breach of warranty; (2) the statute of limitations barred the breach of warranty claims; (3) Adams's negligent misrepresentation claim is not cognizable under Pennsylvania law; (4) Adams failed to sufficiently plead her negligent misrepresentation claim; and (5) Adams failed to state a claim for negligent failure to warn, negligent design, and negligent manufacture. *See* Br. in Supp. of the Zimmer Defs.' Mot. to Dismiss the Pl.'s Compl. at 1, Doc. No. 8-1.

of warranty claims, and (2) denying the motion to dismiss in all other respects.  *See* May 2, 2018 Order, Doc. No. 10.  Adams filed an amended complaint on July 6, 2017.  Doc. No. 31.

Four days later, Adams moved for leave to file a second amended complaint, and the court granted her motion as unopposed on July 11, 2017.  Doc. Nos. 32, 33.  Per the court's order, the clerk of court docketed the second amended complaint.  Doc. No. 34.  The second amended complaint asserts a strict liability manufacturing defect claim and negligence claims based on manufacturing defects, design defects, and failure to warn.  *See* Second Am. Compl. at 15–20.  Zimmer filed an answer with affirmative defenses to the second amended complaint on July 25, 2017.[2]  Doc. No. 36.

The parties engaged in fact and expert discovery for approximately nine months.  During discovery, Adams served three expert reports on the defendants.  Doc. Nos. 61–63.  Zimmer moved to strike one of Adams's engineering expert's testimony as duplicative, and the court denied the motion without prejudice.  Doc. Nos. 67, 71.  Shortly thereafter, Zimmer served its own expert reports on Adams.  Doc. Nos. 72, 73.

On May 29, 2018, Zimmer moved to have the court extend the deadline to complete expert depositions and file *Daubert* motions.  Doc. No. 74.  In the motion, Zimmer requested that the deadline for filing dispositive motions remain unchanged even though, under their new proposed schedule, it would occur before the completion of expert depositions, since their forthcoming dispositive motion was unrelated to the expert testimony.  *See* Mot. Leave Conduct Expert Deps. and File *Daubert* Mots.  Adams agreed to the extension of time to complete expert depositions and file *Daubert* motions but objected to leaving the deadline for dispositive motions unchanged.  *See id.*

---

[2] Zimmer's ninth affirmative defense raises the statute of limitations bar.  *See* The Zimmer Defs.' Answer to Pl.'s Second Am. Compl. at 33.

Before the court decided the motion, Zimmer filed a motion for summary judgment on May 29, 2018, accompanied by a statement of undisputed facts and a brief in support of the motion. Doc. Nos. 75–77. After a telephone conference with the parties on June 1, 2018, the court granted Zimmer's motion for leave to conduct expert testimony and file *Daubert* motions. Doc. No. 81. In the order, the court set deadlines for the remaining expert discovery, filing *Daubert* motions, and Adams's response to Zimmer's motion for summary judgment. *See* June 1, 2018 Order.

On June 29, 2018, Adams filed a response in opposition to Zimmer's motion for summary judgment, along with a response to Zimmer's statement of facts and a counterstatement of undisputed material facts. Doc. Nos. 89, 90. In her response to Zimmer's motion, Adams stated that she is no longer pursuing her manufacturing defect claims.[3] Pl.'s Resp. Opp'n Zimmer's Mot. Summ. J. ("Pl.'s Resp."), at 1 n.1. Zimmer filed a reply in support of its motion for summary judgment on July 6, 2018. Doc. No. 100. Zimmer's motion for summary judgment is now ripe for adjudication.[4]

## II.     FACTUAL BACKGROUND

The undisputed facts are as follows: Adams began suffering right hip pain in 2008. *See* Zimmer's Statement Undisputed Facts ("Zimmer's SUF") at ¶ 1, Doc. No. 76; Pl.'s Resp. Def.'s Statement Facts and Counterstatement Undisputed Material Facts ("Pl.'s SUF") at ¶ 1, Doc. No. 90. After Adams's treating physician recommended she see an orthopedic specialist, Adams presented to Dr. Prodromos Ververeli on September 22, 2010. *See* Zimmer's SUF at ¶ 2; Pl.'s

---

[3] Therefore, only Adams's design defect and failure to warn claims remain.

[4] In addition to the instant motion for summary judgment, Zimmer filed (1) a motion to bifurcate the trial, (2) three motions to exclude the testimony of three of Adams's experts, and (3) a second motion for summary judgment. *See* Doc. Nos. 92–95. Adams filed a motion to strike the second motion for summary judgment as untimely. *See* Doc. No. 98. On July 10, 2018, the court entered an order scheduling oral argument on the two motions for summary judgment and the motion to strike and staying all deadlines pending further order of court. *See* July 10, 2018 Order, Doc. No. 103.

SUF at ¶ 2.  Dr. Ververeli diagnosed Adams with advanced degenerative arthritis in her right hip and recommended a total right hip replacement.  *See* Zimmer's SUF at ¶ 3; Pl.'s SUF at ¶ 3; *see also* Pl.'s SUF Ex. A ("Adams Dep.") at 21–22.

On January 18, 2011, Dr. Ververeli performed a total right hip replacement surgery and implanted a Zimmer hip prosthesis ("Zimmer Device") into Adams's right hip.[5]  *See* Zimmer's SUF at ¶ 5; Pl.'s SUF at ¶ 5.  Initially, Adams did well after her surgery, but she returned to see Dr. Ververeli on September 21, 2012, because of recurrent right hip pain.  *See* Zimmer's SUF at ¶ 11; Pl.'s SUF at ¶ 11.  That day, Dr. Ververeli diagnosed Adams with right hip bursitis and gave her a steroid injection around the outside of her hip.[6]  *See* Zimmer's SUF Ex. B ("Ververeli Dep.") at 42–44.  Approximately one month later, Adams returned to Dr. Ververeli for a follow-up visit because she was still suffering from right hip pain.  *See id.* at 45.  Dr. Ververeli gave her another steroid injection, and his working diagnosis at the time remained right hip bursitis.  *See id.* at 45–46.

Adams's right hip pain continued to progress, and when she saw Dr. Ververeli next on January 2, 2013, he developed a three-part treatment plan:  (1) blood tests to check for inflammation or infection; (2) testing of her metal ion levels "because there had been reports of potential adverse local tissue reaction";[7] and (3) a bone scan to determine if the implant was loosening.  *See id.* at 48.  Although the bone scan did not show loosening or stress fracture,

---

[5] The exact name of the Zimmer hip prosthesis at issue is unclear from the parties' submissions.  *Compare* Zimmer's SUF at ¶ 5 ("Zimmer M/L Taper Kinectiv Stem and Neck . . . and Versys Femoral Head") *with* Second Am. Compl. at ¶ 1 ("Zimmer M/L Taper with Kinectiv® Technology Hip Implant System") *and* Pl.'s Resp. at 1 ("Zimmer M/L Taper Hip Prosthesis with Kinectiv® Technology") *and* Pl.'s SUF at ¶ 5 ("Zimmer Porous Hip Prosthesis with Kinectiv® Technology").

[6] Dr. Ververeli defined bursitis as "an inflammation of the local tissues on the outside of the hip where the muscle attaches to the bone in the greater trochanteric region."  Zimmer's SUF Ex. B at 43.

[7] Dr. Ververeli defined adverse local tissue reaction as "an unusual response around a site that's typically caused by an offending factor.  That factor can be metal wear debris causing a proliferation of reactive tissue around that particular joint or area."  Ververeli Dep. at 13; *see* Zimmer's SUF at ¶ 17; Pl.'s SUF at ¶ 17.

Adams's metal ion levels were higher than normal, and the blood test results caused Dr. Ververeli to have Adams evaluated for potential infection. *See id.* at 51–53. Two weeks later Dr. Ververeli saw Adams again and, based on his findings, he informed Adams that he believed she might be suffering from either an infection or synovitis.[8] *See* Zimmer's SUF at ¶ 21; Pl.'s SUF at ¶ 21. The next day, Dr. Ververeli performed an arthrotomy in an attempt to definitively determine whether there was an infection.[9] *See* Zimmer's SUF at ¶ 23; Pl.'s SUF at ¶ 23; *see also* Ververeli Dep. at 56–57. The tissue cultures from the arthrotomy were negative for infection, nonetheless, an infectious disease consultant placed Adams on antibiotics because fluid removed during the surgery was cloudy. *See* Zimmer's SUF at ¶ 23; Pl.'s SUF at ¶ 23; Ververeli Dep. at 61–62.

As of January 30, 2013, Dr. Ververeli's working diagnosis was "a subclinical or a very low-grade infection," and he explained to Adams three potential future outcomes and treatment plans: (1) eradication of the infection and "[s]he goes back to normal and everything is fine"; (2) the infection gets worse and she needs a two-stage revision surgery to eradicate the infection; or (3) infection was never the problem and a one-stage revision surgery is necessary to revise the implanted components. *See* Ververeli Dep. at 65, 157–58. Adams saw Dr. Ververeli next on February 6, 2013, and the "history" section of his office note states, "[s]he . . . has potential wear and synovitis issues with positive metallosis."[10] Pl.'s SUF Ex. O, Doc. No. 90-19. Further, the "plan" section of the office note states, "[i]f this represents more of a synovitis and metallosis, she may require a one stage revision." *Id.* Dr. Ververeli testified that at this time, he discussed

---

[8] Dr. Ververeli defined synovitis as "an inflammatory process where synoval fluid is being produced and there is a reaction. That could be associated with a reaction to the local adverse tissue, et cetera. It's not infectious." Ververeli Dep. at 154; *see also* Zimmer's SUF at ¶ 22; Pl.'s SUF at ¶ 22.

[9] Dr. Ververeli explained that an arthrotomy is a minimally invasive surgery where soft tissue specimens are removed. The removed specimens are sent to a laboratory for inspection. *See* Ververeli Dep. at 58, 59.

[10] Dr. Ververeli defined metallosis as "metal wear that then causes a reaction to the surrounding tissues." Ververeli Dep. at 17; *see also* Zimmer's SUF at ¶ 16; Pl.'s SUF at ¶ 16.

with Adams that the Zimmer Device may be the cause of her problem. *See* Ververeli Dep. at 159; *see also id.* at 67. Between February 2013 and September 2014, Adams progressed reasonably well besides intermittent pain and swelling. *See id.* at 68–70.

Then, on November 28, 2014, Adams dislocated her right hip while taking a shower. *See* Zimmer's SUF at ¶ 31; Pl.'s SUF at ¶ 31. At the time, Adams knew the Zimmer Device dislocated and thought this was "[a]bsolutely" abnormal. Zimmer's SUF at ¶ 32; Pl.'s SUF at ¶ 32. Nonetheless, Adams did not tie the dislocation to a "potential adverse event" related to the Zimmer Device. *See* Pl.'s SUF at ¶ 32; *see also* Adams Dep. at 145–46.

Adams saw Dr. Ververeli again on January 7, 2015; she was suffering from persistent pain in her right hip—a kind of pain she had not experienced before the dislocation. *See* Adams Dep. at 150. X-rays taken that day revealed calcification and distention around Adams's right hip which were not present one year prior. *See* Zimmer's SUF at ¶ 33; Pl.'s SUF at ¶ 33. Dr. Ververeli believed the calcification and distention were caused either by local tissue reaction or a reaction to the November 28, 2014 dislocation. *See* Ververeli Dep. at 73; *see also id.* at 165. At this point, he recommended further investigation and ordered a CT scan. *See id.* at 75. The "plan" section of Dr. Ververeli's office note from the January 7, 2015 visit states:

> The diagnosis and management was reviewed with the patient and her husband. Prior to initiating physical therapy rehabilitation program, I feel it is recommended to undergo further investigation of the right hip. If this is an adverse local tissue reaction from wear and fretting to the hip trunnion junction. [sic] She may require revision of the femoral component and change to a ceramic femoral head.[11]

---

[11] Dr. Ververeli explained that "[f]retting and metal wear debris . . . are very similar. There's two types of corrosion or potential wear. One is a mechanical corrosion which would be fretting or debris." Ververeli Dep. at 16. He defined metal wear debris as "microscopic particular debris caused by a surface rubbing against another surface . . . . In this case you have a microscopic particular debris." *Id.* at 13–14. He explained further that, regarding Adams's case, "[f]retting is the cobalt-chrome onto the titanium with a mechanical particular debris being generated from that junction." *Id.* at 16–17.

Pl.'s SUF Ex. R at ECF p. 1 (footnote added), Doc. No. 90-22. Dr. Ververeli testified regarding the January 7, 2015 visit:

> Q.     You felt that it was recommended to undergo further investigation. So, when you make this you're explaining why you're making that recommendation, is that correct?
>
> **A.     Yes.**
>
> Q.     And [the office note] says if this is adverse local tissue reaction from wear and fretting to the hip injunction [sic] she may require a revision and change to ceramic head.
>
> **A.     Correct.**
>
> Q.     And you indicated that you had previously gone over the importance of this and the results of this if further studies did show adverse local tissue reaction?
>
> **A.     Yes.**

Ververeli Dep. at 166.

The January 12, 2015 CT scan results showed a "well-circumscribed fluid collection in the subcutaneous tissues lateral to the right hip," which Dr. Ververeli testified "basically goes along with saying that there's a reaction to the tissue around the hip replacement." Pl.'s SUF Ex. S, Doc. No. 90-23; Ververeli Dep. at 167; *see also* Ververeli Dep. at 74–75. Consequently, Dr. Ververeli's nurse called Adams that day and informed her she "was positive for adverse local tissue reaction" and that Dr. Ververeli recommended a hip revision surgery. *See* Ververeli Dep. at 168; *see also* Zimmer's SUF Ex. C. When asked about this phone call in her deposition, Adams testified that she recalled having the conversation and recalled being told a revision was necessary, but she does not remember being informed she was positive for adverse local tissue reaction. *See* Adams Dep. at 153–54. Nevertheless, at this point Adams understood that a hip revision was necessary, and she knew this meant that the Zimmer Device would be replaced with

a new prosthesis. *See id.* The following day, January 13, 2015, Adams underwent a hip aspiration which ruled out infection. *See* Zimmer's SUF at ¶ 41; Pl.'s SUF at ¶ 41.

Adams saw Dr. Ververeli next on January 21, 2015, and they discussed her test results. *See* Zimmer's SUF at ¶ 42; Pl.'s SUF at ¶ 42. At this visit, Dr. Ververeli confirmed his recommendation of hip revision surgery but also discussed non-operative options with Adams. *See* Ververeli Dep. at 74–76. Adams testified that she knew she did not have an infection at this point. Zimmer's SUF at ¶ 46; Pl.'s SUF at ¶ 46. As to his discussion with Adams that day, Dr. Ververeli testified:

> Q.      [The office note states that] Patient is now advised she'll require femoral component revision. Did you explain to her why a revision would hopefully relieve her of her symptoms?
>
> **A.      Yes.**
>
> Q.      Do you recall what that conversation was about?
>
> **A.      It was basically to correct the problem and telling her how there was the fretting wear and local reaction to the existing prosthesis.**

Ververeli Dep. at 170.

By January 30, 2015, Adams decided to proceed with hip revision surgery. *See* Zimmer's SUF at ¶ 48; Pl.'s SUF at ¶ 48. The office note from January 30, 2015, reveals that Dr. Ververeli confirmed Adams had right hip metallosis, although Adams has no recollection of Dr. Ververeli informing her she had metallosis. *See* Ververeli Dep. at 175; Adams Dep. at 161–62. Adams provided the following testimony regarding the January 30, 2015 office visit:

> Q.      Okay. So he told you you needed a revision, and you just said, okay – or you didn't question him any further –
>
> **A.      I knew there was a problem with my hip because of the pain, and it was just getting worse all the time.**

Q.    Okay.

**A.    And I tied in the dislocation so close to the next revision.  It just seemed that something was wrong.  It had to come out.**

Q.    Okay.

**A.    It was a problem.**

Adams Dep. at 166; *see also* Zimmer's SUF at ¶ 52; Pl.'s SUF at ¶ 52.  By this point, Adams knew another Zimmer Device was not going to be implanted during the revision surgery, and she would have objected if Dr. Ververeli had planned to use a Zimmer Device.  *See* Zimmer's SUF at ¶ 53; Pl.'s SUF at ¶ 53.  Adams was not amenable to further conservative treatment because she "just wanted [the prosthesis] gone."  Adams Dep. at 168.

On February 9, 2015, three days before the revision surgery, Adams signed an informed consent for the surgery that stated, "[t]he above treatment/surgery . . . will be done for the care and diagnosis of: Right hip metalosis [sic]."  *See* Zimmer's SUF at ¶ 54; Pl.'s SUF at ¶ 54; *see also* Zimmer's SUF Ex. D.  Although she acknowledges that she signed the informed consent form, Adams claims that she did not read it, and that she does not recall Dr. Ververeli diagnosing her with metallosis.  *See* Adams Dep. at 170–71; *id.* at 162.  Nonetheless, Dr. Ververeli testified that Adams had an adequate understanding of what her surgery was for at the time.  *See* Ververeli Dep. at 177–78.

Adams underwent right hip revision surgery on February 12, 2015, during which Dr. Ververeli removed the Zimmer Device and replaced it with a ceramic DePuy Johnson and Johnson device.  *See* Pl.'s SUF Ex. AA, Doc. No. 90-1.  Dr. Ververeli's preoperative and postoperative diagnoses were identical: "Previous right hip replacement with instability, wear and osteolysis with adverse local soft tissue reaction."  *Id.*  During the surgery, Dr. Ververeli confirmed his opinion—the opinion he developed prior to surgery—that Adams was suffering an

adverse local tissue reaction to the Zimmer Device. *See* Ververeli Dep. at 94. Dr. Ververeli discussed his opinion regarding the cause of Adams's problems with her at some point after the surgery, either while she was admitted and recovering or in an office visit thereafter. *See* Ververeli Dep. at 196–97.

## III.  DISCUSSION

### A.  <u>Standard of Review</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing

summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.       The Parties' Arguments

In the motion for summary judgment, Zimmer argues that Pennsylvania's two-year statute of limitations bars Adams's claims. *See* Br. Supp. Zimmer's Mot. Summ. J. ("Zimmer's Br.") at 5, Doc. No. 77. Since Adams did not file this action until February 10, 2017, Zimmer asserts that her claims are time-barred unless she can prove she should not have known that the Zimmer Device caused her injuries until after February 10, 2015. *See id.* at 6. Zimmer contends that Adams cannot meet her burden because she knew she suffered an injury by January 30, 2015, since she admitted that after her dislocation she began suffering a pain she had not previously experienced. *See id.* at 9. Zimmer further argues that reasonable minds could not disagree that Adams knew or reasonably should have known the Zimmer Device caused her injuries by no later than January 30, 2015, because by that date, Dr. Ververeli had told her that she was experiencing adverse local tissue reaction and would need hip revision surgery. *See id.* at 9–10. To support its argument that Adams not only knew she was injured but should have

been able to link her injury to the Zimmer Device, Zimmer points to Adams's concession that by January 30, 2015, she knew the Zimmer Device had to come out and would have objected if Dr. Ververeli was going to implant another Zimmer hip prosthesis. *See id.* at 9.

Adams counters by arguing that she did not make the factual connection between her injury and the Zimmer Device until after her February 12, 2015 revision surgery. *See* Pl.'s Resp. at 10, Doc. No. 89. Adams asserts that she cannot be expected to have more knowledge than Dr. Ververeli, her treating physician at the time, and prior to the surgery she was never "told there was some defect or specific nature of the implanted Zimmer Device that was the cause of any of her problems." *Id.* at 9. Adams thought her symptoms were "related to her personally" or "caused by an external factor unrelated to [the Zimmer Device]." *Id.* Accordingly, Adams argues that Pennsylvania's "discovery rule" tolled the statute of limitations until after the revision surgery on February 12, 2015, and therefore she filed suit two days within the two-year limitations period. *See id.*

## C.      Pennsylvania's Discovery Rule

Under Pennsylvania law, a suit to recover damages for personal injury caused by the negligence of another is subject to a two-year statute of limitations.[12]  42 Pa. C.S. § 5524(2). The two-year period begins to run once the injured party's "right to institute and maintain a suit arises." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005). Therefore, the injured party has two years from when she suffers her injury to bring a cause of action. *See id.*

Generally, once this two-year period expires, the injured party is barred from bringing suit. *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011). Nonetheless, the "discovery rule" is an exception to Pennsylvania's statute of limitations that tolls the statute "[i]n certain

---

[12] Since both parties cite Pennsylvania law exclusively in their submissions to the court on this issue, they appear to agree that Pennsylvania law applies.

cases involving latent injury, and/or instances in which the causal connection between an injury and another's conduct is not apparent." *Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009). Pennsylvania applies the discovery rule narrowly, placing a heavy burden on plaintiffs invoking the rule. *See Gleason*, 15 A.3d at 484 ("Pennsylvania's formulation of the discovery rule reflects a narrow approach to determining accrual for limitations purposes and places a greater burden upon Pennsylvania plaintiffs vis-à-vis the discovery rule than most other jurisdictions." (internal quotation marks omitted)); *Wilson*, 964 A.2d at 362 ("The party relying on the discovery rule bears the burden of proof."); *see also Brunea v. Gustin*, 775 F. Supp. 844, 846 (W.D. Pa. 1991) ("The party seeking to invoke the discovery rule is under a heavy burden of inquiry.").

The discovery rule protects the rights of an injured party who is unable, even through the exercise of reasonable diligence, to discover that another party caused her injury within the two-year limitations period. *See Fine*, 870 A.2d at 858. In such a situation, the two-year limitations period does not begin to run until the injured party "discovers, or reasonably should discover, that she has been injured and that her injury has been caused by another party's conduct." *Wilson*, 965 A.2d at 361–62.

The discovery rule tolls the statute of limitations only until the injured party has "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause."[13] *Gleason*, 15 A.3d at 484 (quoting *Wilson*, 964 A.2d at 364). Additionally, the injured party does not need to know she has a cause of action to begin the limitations period. *Wilson*, 964 A.2d at 364 n.10. At bottom, the limitations period begins to

---

[13] It is worth noting that in the Third Circuit, "an unrebutted suspicion" of an injury caused by another is sufficient to trigger the statute of limitations. *See, e.g.*, *Juday v. Merck & Co Inc*, 730 F. App'x 107, 109–12 (3d Cir. 2018); *Debiec v. Cabot Corp.*, 352 F.3d 117, 132 (3d Cir. 2003).

run as soon as the injured party receives enough facts to provide her with actual or constructive knowledge that she was injured and that there is a factual connection between her injury and another party's conduct. *See id.* at 361–62. Therefore, as soon as, through the exercise of reasonable diligence, the injured party should be able to link her injury to the conduct of another, the clock begins to run. *See id.*

The party invoking the discovery rule has the burden of showing that even though she exercised reasonable diligence, she was unable to figure out that her injury was caused by the conduct of another within the limitations period. *See Cochran v. GAF Corp.*, 666 A.2d 245, 250 (Pa. 1995). Reasonable diligence requires a party to exhibit "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." *Fine*, 870 A.2d at 858 (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000)). "[A] diligent investigation may require one to seek further medical examination as well as competent legal representation." *Cochran*, 666 A.2d at 249. And reasonable diligence, although an objective standard, "is to be applied with reference to individual characteristics." *Coleman v. Wyeth Pharm., Inc.*, 6 A.3d 502, 510 (Pa. Super. 2010) (citing *Wilson*, 964 A.2d at 366). Accordingly, determining when an injured party knew, or should have known, that she was injured by another party's conduct, is a fact-sensitive inquiry that is generally a question for the jury. *Wilson*, 964 A.2d at 362. Nonetheless, "courts may resolve the matter at the summary judgment stage where reasonable minds could not differ on the subject." *Id.*

### D. Analysis

To determine whether Adams's claims are time-barred as a matter of law, the court must determine whether reasonable minds could differ as to whether she knew, or should have known,

of her injury and its cause more than two years prior to the date she brought this action.[14]  Adams

bears the burden of proving that she did not have, and should not have had, this knowledge.  *See*

*id.*  Adams has not met this burden; reasonable minds could not disagree that she knew or should

have known of her injury and its connection to the Zimmer Device before February 10, 2015.

Beginning with when Adams knew or should have known that she suffered an injury, she

contended at oral argument that she should not have known that she suffered an injury before her

replacement surgery on February 12, 2015.  Her position on this point is not substantiated by the

undisputed evidence in the record.  First, in her submission to the court in response to Zimmer's

motion for summary judgment, Adams appears to concede that she knew she suffered an injury

prior to February 10, 2015.  *See* Pl.'s Resp. at 7 ("Mrs. Adams knew that her [prior hip

replacement] surgery had a bad outcome.").  Second, Adams testified at her deposition that after

the November 28, 2014 dislocation she began to experience persistent pain in her right hip; a

new type of pain which she had not previously suffered.  *See* Adams Dep. at 150.  She also

testified that by January 30, 2015, she "knew there was a problem with [her] hip because of the

pain, and it was just getting worse all the time."  *Id.* at 166.  Indeed, the record is replete with

instances of Adams testifying about the pain she experienced from late 2012 to early 2015 and

her frequent visits to see Dr. Ververeli during that time.  *See, e.g.*, *id.*

Adams did not have to know the full extent of her injury.  *See Wilson*, 964 A.2d at 364.

Rather, she only had to have "actual or constructive knowledge of at least some form of

significant harm" for the statute to run.  *See id.*  Adams's testimony regarding her pain and her

visits to see Dr. Ververeli is more than sufficient to establish that she should have known of at

least some form of significant harm.  Accordingly, no reasonable juror could find that Adams has

---

[14] Adams alleges that she suffered multiple injuries to her right hip because of the Zimmer device.  In an attempt to
avoid confusion, the court refers to all of Adams's injuries associated with the Zimmer device as her "injury."

satisfied her burden of showing she should not have known that she was injured before February 10, 2015.

Turning to the second prong,—whether Adams knew or should have known of a connection between her injury and the Zimmer Device—the court finds that Adams knew or should have known that the Zimmer Device was a factual cause of her injury by the time she decided to proceed with hip revision surgery on January 30, 2015. As discussed above, Adams testified that when her right hip dislocated in November 2014, she thought this was abnormal, and she began to experience pain that she had not experienced prior to the dislocation. *See* Zimmer's SUF at ¶ 32; Pl.'s SUF at ¶ 32; *see also* Adams Dep. at 150. At Adams's next appointment with Dr. Ververeli on January 7, 2015, Dr. Ververeli recommended "further investigation" of her right hip and ordered a CT scan. Ververeli Dep. at 75; *see id.* at 166. Dr. Ververeli explained to Adams that "if adverse local tissue reaction from wear and fretting to the hip injunction [sic]" was causing the problem, "she may require a revision and change to ceramic head." *Id.* at 166; *see also* Pl.'s SUF Ex. R at ECF p. 1. By this point, Adams knew or should have known that if the results of Dr. Ververeli's investigation showed adverse local tissue reaction from wear and fretting, she would need to have him replace the Zimmer Device with a new prosthesis. Put differently, Adams knew or should have known that if she needed Dr. Ververeli to replace the Zimmer Device, it was because the Zimmer Device was a cause of the problem.

Dr. Ververeli's admonitions came true when his staff called Adams on January 12, 2015, and informed her that she "was positive for adverse local tissue reaction," and that Dr. Ververeli recommended hip revision surgery. *See* Ververeli Dep. at 168; *see also* Zimmer's SUF Ex. C. The next day, an aspiration definitively ruled out infection, eliminating it as a possible cause of

Adams's injury. *See* Zimmer's SUF at ¶ 41; Pl.'s SUF at ¶ 41. Consequently, when Dr. Ververeli confirmed, at Adams's January 21, 2015 office visit, that a revision surgery was necessary, not only did Dr. Ververeli's previous warnings come to fruition, but at this point Adams could no longer suspect infection as the cause of her injury. Moreover, once Adams knew for certain that Dr. Ververeli needed to remove the Zimmer Device (knowledge that she had by January 30, 2015), she had received enough facts to make the connection between her injury and the Zimmer Device, and no reasonable juror could conclude otherwise.

Adams contends that she "does not recall Dr. Ververeli telling her she was positive for adverse tissue reaction." Pl.'s Statement of Additional Undisputed Material Facts in Supp. of Her Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Add'l SUF") at ¶ 54, Doc. No. 90. Nevertheless, "[a] lack of memory does not create a genuine dispute because an answer such as 'I don't recall' is insufficient evidence to rebut affirmative testimony or at least create 'fair doubt.'" *Keating v. Pittston City*, 643 F. App'x 219, 224–25 (3d Cir. 2016) (citing *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005)).

Additionally, by January 30, 2015, Adams had made the decision to proceed with hip revision surgery. She testified that she "tied in the dislocation so close to the next revision. It just seemed that something was wrong. It had to come out." Adams Dep. at 166. These statements show that Adams thought removing the Zimmer Device would be a step in the right direction to alleviate the problems she was having with her hip. Reasonable minds could not disagree that by the time Adams committed to the revision surgery on January 30, 2015, she knew or reasonably should have known that the Zimmer Device caused her injury.

But even if the court were not persuaded that Adams possessed or should have possessed the requisite knowledge by January 30, 2015, the court would still have to grant the motion for

summary judgment. Adams signed the informed consent form on February 9, 2015, which stated that the purpose of the upcoming hip revision surgery was to treat her right hip metallosis. After she signed the consent form, Adams had or should have had the requisite knowledge to link her injury to the metal Zimmer Device which Dr. Ververeli needed to remove.

Adams concedes that she signed the informed consent form, but she contends that she did not read the form and does not recall ever being told she had metallosis. *See* Pl.'s SUF at ¶¶ 49, 54–55. Even if she failed to read the informed consent form, the court must impute to Adams the knowledge that a reasonable person in her situation would have had after signing the form. Regardless of what Adams knew or did not know about her surgery, Pennsylvania's discovery rule is based on an objective view of what a person in the injured party's situation *should* have known. *See Fine*, 870 A.2d at 858. The statute of limitations is tolled only until the injured party should have, through the exercise of reasonable diligence, actual or constructive knowledge that another party's conduct caused her injury. *See Wilson*, 964 A.2d at 363–64. Reasonable diligence in this case requires a person who is undergoing surgery to be aware of the purpose of their surgery. Accordingly, the very latest conceivable date by which Adams should have known that the Zimmer Device caused her injury was February 9, 2015, two years and one day before she brought this suit.

Adams argues that it was not until after the revision surgery on February 12, 2015, when Dr. Ververeli informed her that there was in fact "corrosion and metal wear products shedding from the head-neck junction of the implant," that she was able to make the connection between her injury and the Zimmer Device. *See* Pl.'s Resp. at 18. Even after examining the facts in the light most favorable to Adams, and resolving all reasonable inferences in her favor, the record does not support her assertion that she should not have been able to connect her injuries to the

Zimmer Device until after the revision surgery. Adams did not need to know that metal wear debris from the Zimmer Device caused her injuries to start the limitations period, she only needed actual or constructive knowledge that the Zimmer Device was a cause of her injuries. No reasonable juror could find that Adams was unaware, or should not have been aware, of a connection between her injury and the Zimmer Device until after her revision surgery. After the revision surgery, Dr. Ververeli did in fact *confirm* his preoperative diagnosis, and inform Adams of the precise cause of her injuries, but knowledge of precise medical cause is not required to begin the two-year limitations period. *Wilson*, 964 A.2d at 364 n.10.

Adams's remaining argument, that she was not put on notice of the *defective* nature of the Zimmer Device prior to February 10, 2015, is likewise unpersuasive, as it misstates the legal standard. *See* Pl.'s Resp. at 7. Adams argues that she cannot be expected to have more knowledge than her treating physician at the time, and Dr. Ververeli was unable to conclude that the Zimmer Device was defective until after removing it during the revision surgery. *Id.* at 9. But the discovery rule tolls the two-year limitations period until the injured party knows or reasonably should know that she has been injured by another party's conduct, not until the injured party discovers that another party's *negligent* conduct caused her injury. *See Fine*, 870 A.2d at 858; *Wilson*, 964 A.2d at 364 n.10.

The discovery rule tolled the statute of limitations for Adams's claims until, at most, January 30, 2015. From that point on, Adams had two years to investigate her injuries and initiate a lawsuit. Contrary to Adams's argument, this does not mean that she had to file suit the instant she suspected that the Zimmer Device caused her injury. Beginning January 30, 2015, it became Adams's responsibility to seek medical advice, retain legal counsel, and accumulate enough factual knowledge to determine whether she should bring a lawsuit. Pennsylvania law

provided her with two years to investigate her injury before bringing suit, and she unfortunately waited beyond that two years to do so.

Statutes of limitations effect the "prompt pursuit of legal rights and the avoidance of the inconvenience and prejudice resulting from deciding stale cases on stale evidence." *Ingenito v. AC & S, Inc.*, 633 A.2d 1172, 1175 (Pa. Super. 1993) (internal quotations omitted). "Although the purpose of the 'discovery rule' is to mitigate in worthy cases the harshness of an absolute and rigid period of limitations, the rule cannot be applied so loosely as to nullify the purpose for which a statute of limitations exists." *Id.* Adams undeniably suffered painful and life-altering injuries. However, she has failed as a matter of law to satisfy her burden of showing that she should not have known that the Zimmer Device caused her injuries more than two years before bringing this suit.

## IV.    CONCLUSION

In sum, the court grants Zimmer's motion for summary judgment because, before February 10, 2015, Adams possessed, or should have possessed, the requisite knowledge that the Zimmer Device caused her injury, triggering the commencement of the two-year statute of limitations, and no reasonable juror could conclude otherwise on the undisputed facts of this record. From late 2012 to early 2015, Adams experienced severe right hip pain and visited Dr. Ververeli numerous times. As her treatment with Dr. Ververeli progressed, he informed her that she had metallosis and an adverse local tissue reaction. Because of this diagnosis, Dr. Ververeli recommended having the Zimmer Device removed and replaced with a ceramic device. Adams agreed to have him remove the Zimmer Device and knew that he was going to replace it with a non-Zimmer prosthesis, and she would have objected if Dr. Ververeli had planned to use a Zimmer device. And finally, she signed the informed consent form that stated the surgery was

due to metallosis in her right hip.  On these facts, the court finds as a matter of law that Adams knew, or should have known, that she was injured and that her injury was causally connected to the Zimmer Device.

The court recognizes that Adams suffered serious injuries and that granting Zimmer's motion will preclude Adams from obtaining legal recourse before a jury.  But the court cannot arbitrarily enforce the statute of limitations.  Thus, despite the unfortunate nature of this outcome, the court is constrained to grant the motion for summary judgment.

The court will enter a separate order.


BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.